**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **DeVAUGHN JOHNSON** | * | |
| **Petitioner,** | * | |
| **v** | * | **Civil Action No. GJH-21-21** |
| **WILLIAM BOHRER,** | * | |
|   *Warden*, | | |
| **MARYLAND ATTORNEY GENERAL,** | * | |
| **Respondents.** | * | |

***

**<u>MEMORANDUM OPINION</u>**

In their Answer to the above-entitled Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, Respondents assert that the petition is time-barred and that there is no cognizable basis for reaching the merits of the claims asserted.  ECF No. 7.  Petitioner DeVaughn Johnson, who proceeds pro se, asserts in his Motion to Establish Entitlement to Review that he is actually innocent and that this Court may therefore reach the merits of his claims and grant his petition. ECF No. 9.  No hearing is necessary to resolve the matters pending.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2018); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)).  For the reasons set forth below, the petition shall be dismissed as untimely and a certificate of appealability shall not issue.

## I.  Background

### A.  Trial

After a jury trial lasting from September 5 through 18, 1995, Johnson was convicted of the March 29, 1992 first-degree murder of Marvin Willett in the Circuit Court for Baltimore City.

Testimony at trial established that the shooting took place around 7:25 p.m. near the corner of Pennsylvania and Gold Streets.  ECF No. 7-6 at 71-72 (Testimony of Det. Robert Patton).  Willett was accompanied by Lawrence Walker when he was shot; Walker was not injured.  *See* ECF No. 7-1 at 112 (Court of Spec. Appeals Op.); ECF No. 7-6 at 2-10 (partial transcript of Lawrence Walker's trial testimony).  The victim was found lying face down, on his right side and had suffered a gunshot wound to the right side of his neck.  *Id*. at 73-74 (Testimony of Det. Patton).  He was pronounced dead at the scene.  *Id*. at 96.

Investigation into the shooting involved police attempts to locate eyewitnesses who could identify the shooter.  ECF No. 7-6 at 77-78.  Detective Patton explained that there was limited information at the scene of the crime and that he concluded he needed to "employ some non-conventional police tactics[1] to identify witnesses" and to use surveillance and field interviews to locate information about the shooter.  *Id*.  As a result of the methods used, Detective Patton located a woman in the area who gave him information about the identity of the shooter and later identified a photograph of the suspect.  *Id*. at 78-79.  Patton also recalled interviewing Hezekiah Marvin Allen at the scene and, later, at the Homicide Unit.  *Id*. at 79.  At that time, Allen gave police no information regarding the shooting.  *Id*. at 79-80.

On April 1, 1992, Lakisha Denise Hargrave, who was 14 years old at the time of the murder, was interviewed at the Homicide Unit after she approached a police officer at her school about witnessing the March 29, 1992 shooting.  ECF No. 7-6 at 80.  During Hargrave's testimony at trial, she claimed she could not remember the interview conducted by Detective Patton, could not remember testifying in front of the grand jury, nor could she remember the shooting itself.

---

[1]     Patton explained that the non-conventional tactics involved having other specialized police units to focus on the area where the shooting took place and to arrest anyone who was violating the law in that area.  ECF No. 7-6 at 77.

ECF No. 7-6 at 16-19 (Testimony of Lakisha Hargrave).  Patton testified that when Hargrave was initially interviewed at the police station, she identified the person she witnessed shooting Willett. *Id*. at 80-82.  Hargrave was interviewed a second time and provided more details regarding the shooting and during a third interview she identified a photograph of the person she knew as "Devo" because he was the one who killed Willett.  *Id*. at 83-91.  Patton recalled that during the photographic identification process Hargrave began to cry and said she did not want to identify anyone and no longer wanted to be involved.  *Id*. at 89.  Patton reassured Hargrave and told her she had no reason to be afraid and that they would protect her.  *Id*. at 90.  After looking at each of the six photographs handed to her, Hargrave again said she did not want to be involved and she was again reassured.  *Id*. at 90.  After Hargrave was given the photos again, she identified photograph 5 as "Devo" and said, "he didn't do the shooting."  *Id*. at 91.  Hargrave was again reassured and admitted that Devo was the one that killed Willett.  *Id*.

During Hargrave's testimony before the grand jury,[2] she identified Johnson as the person she knew as Devo and said he told her to call him Bryan[3] Madison because he did not want the police to know who he was.  *Id*. at 31-32.  Hargrave also told the grand jury she did not want to identify Johnson as the shooter during the photographic line-up because she was afraid he would kill her or have her killed.  *Id*. at 42.  During her testimony at trial, Hargrave claims she did not remember Johnson threatening her and identified Johnson as the man she knew as Devo.  *Id*. at 44-45.  On cross-examination Hargrave told the jury that she struggles with depression and had been hospitalized for a suicide attempt.  *Id*. at 51-54.

---

[2]     A large portion of Hargrave's grand jury testimony was read into the record after she claimed she could not remember anything about her statements to the police or her grand jury testimony.  ECF No. 7-6 at 26.
[3]     At other points in the transcript and in other documents, this alias is noted as Bryant Madison.

Case 8:21-cv-00021-GJH   Document 10   Filed 10/25/21   Page 4 of 24


Thomas Conyers, who was also a minor at the time of the shooting, was interviewed by Detective Patton on three occasions. ECF No. 7-7 at 7-8 (Testimony of Thomas Conyers). Patton confirmed that Conyers did not identify anyone as the shooter in the March 29, 1992 incident during the first interview. ECF No. 7-6 at 99. Patton explained that Conyers was arrested on CDS charges and was brought to the Homicide Unit following his arrest. *Id*. at 105-6. Conyers was shown the photographic array developed by Patton and when he got to the third photograph he said without hesitation, "this is Devo; he's the one that killed Mr. Willett." *Id*. at 109-10. When Conyers testified at trial, however, he claimed he only told Patton that Johnson had shot Willett because Patton threatened to charge Conyers with the murder if he did not say that Johnson did it. ECF No. 7-7 at 45-46 (Cross-Examination of Conyers). When confronted during his direct testimony with a transcript of his grand jury testimony, Conyers claimed it was not his testimony and that the court reporter who transcribed it was lying. *Id*. at 31. Conyers claimed he only told Patton he knew Johnson from playing basketball and that he was not present when Willett was shot. *Id*. at 9, 11-12. Conyers also denied seeing all six photographs during the photo array. *Id*. at 14.

A third eyewitness who testified at trial was Hezekiah Marvin Allen, who testified at trial that he used to hang out at Gold and Pennsylvania because his sister lived on an adjoining street. ECF No. 7-7 at 52-53. On the evening of the shooting, Allen was standing at the corner of Gold and Brunt Streets and heard a gunshot. *Id*. at 54. When he heard additional shots fired, Allen ran to his sister's house and saw a man running up the street whom he identified as Johnson. *Id*. at 55. Allen explained that he knew Johnson from around the neighborhood and had known him for a few years. *Id*. at 59. On the night of the shooting Allen told police that the shooter was a bowlegged, short guy approximately 5'2" tall, wearing an orange hoodie. *Id.* at 64-65. He claimed

he did not give police a name the night of the shooting because he was scared but did identify Johnson two weeks later.  *Id*. at 65.  Allen denied seeing a gun in Johnson's hand, but after he was shown the transcript of his grand jury testimony, Allen admitted that he saw who did the shooting and identified Johnson as the shooter.  *Id*. at 66-67; 69.

Allen attempted to back-track his testimony during cross-examination, claiming that he did not see Johnson with a gun in his hand, nor did he see the shooting itself.  ECF No. 7-7 at 76.  He further claimed he was threatened by the police when he gave his statement to them, claiming that he was told he would be charged with the murder if he didn't tell them who did the shooting.  *Id*. at 78-79.  On redirect, Allen acknowledged that he had signed the back of Johnson's picture used in the photo array because he was the man he saw shoot Willett.  *Id*. at 82.  Allen also admitted that there was only one person he saw the night of the shooting who was 5'2" tall, wearing an orange hoodie, and who was bowlegged and that was Johnson.  *Id*. at 83.

The defense called two witnesses who disputed the descriptions of the shooter provided by the State's eyewitnesses.  The first witness was James Elmore Bradford who lived on Gold Street at the time of the trial and lived on Pennsylvania Street at the time of the shooting.  ECF No. 7-7 at 93-94.  Bradford testified that when the shooting took place he was standing in his doorway and heard a shot, but he did not see the actual shooting.  *Id*. at 97.  Bradford said he ducked back into the door and peeked out shortly thereafter.  *Id*.  He saw a man running down the street with a gun in his hand wearing a red or burgundy sweatsuit who he described as being 6'1" and slender.  *Id*. at 97-98.  Bradford said he was sure it was not Johnson who he saw that night because Johnson is short and fat.  *Id*. at 101.  On cross-examination, Bradford admitted that there are a lot of shootings in the area and that he did not remember the dates of the other shootings.  *Id*. at 105-6.

The second witness to testify for the defense was Sarah Brooks who also lived in the area where the shooting took place.  ECF No. 7-8 at 6.  She recalled that on the evening of March 29, 1992, she was standing on a chair fixing a curtain that hung in her window when she saw a brown van pull up and park in front of her door.  *Id*. at 8.  She said that three men got out of the van and walked across the street to the corner of Gold and Pennsylvania.  *Id*.  She saw the three men standing on the street and one man knocked something out of the other's hand and a shot went off just before one of the men fell into the street.  *Id*. at 9.  Brooks stated that Johnson was not one of the men she saw and explained all three men were tall.  *Id*. at 10.  Brooks, like Bradford, was never interviewed by police about the March 29, 1992 incident and each of them first spoke to someone about the shooting approximately one-week before trial when defense counsel visited them.  ECF No. 7-7 at 100; ECF No. 7-8 at 12.  Brooks acknowledged on cross-examination that there are a lot of shootings that take place in her neighborhood, that Johnson's defense counsel provided her with the date of the shooting; and that he had not thought about the shooting until three and one-half years later when counsel asked her about it.  ECF No. 7-8 at 20, 22.

While the jury was deliberating, Johnson, who was out on bail during the trial, was shot in the face and was admitted to shock trauma where he was in critical condition.  ECF No. 7-9 at 4.  Despite the unusual circumstances that caused his absence from the proceedings, the trial judge allowed deliberations to continue.  *Id*. at 9-10.  Although the jury sent a note to the judge indicating they were deadlocked, they reached a verdict shortly thereafter.  *Id*. at 16-18.  On September 18, 1995, the jury found Johnson guilty of murder in the first degree, use of a handgun in the commission of a crime of violence, and possession of a deadly weapon.  *Id*. at 19.  When the jury was polled one juror was weeping but indicated that the verdicts read were also his verdict.  *Id*. at

6

19-21; 23.  Defense counsel's renewed motion for mistrial after the jury was polled was denied.

*Id*. at 22-23.

On May 15, 1996, Johnson was sentenced to serve life plus a consecutive term of 20 years.

ECF No. 7-10 at 22.

### B.      Direct Appeal and Post-Conviction

Johnson, through counsel, filed a direct appeal of his conviction to the Court of Special

Appeals.  Relevant to the issues he poses in the instant federal habeas petition, Johnson challenged

the sufficiency of the evidence to convict him.  The Court of Special Appeals rejected this claim,

stating:

> We hold that the evidence was legally sufficient to support the verdicts.  The Grand Jury testimony of three witnesses identified the appellant as the shooter. Detective Patton testified that all three individuals, when presented with a photo array shortly after the killing, identified the appellant as the shooter.  One of the witnesses, Hezekiah Marion [sic] Allen, testified both on direct examination and on cross examination that he identified the appellant's photograph out of the photo array because, in his words, "that's who did the shooting."  There clearly was sufficient evidence for a rational trier of fact to find that the appellant committed the crimes with which he was charged.

ECF 7-1 at 131 (April 4, 1997 Court of Special Appeals Opinion).  The appeal was denied, and

the appellate court issued the mandate on May 5, 1997.  *Id.* at 132.

In a petition for writ of certiorari filed by counsel on Johnson's behalf, it is acknowledged

that Hargrave and Conyers recanted their identification of Johnson when testifying at trial and that

Allen's testimony was "contradictory."  ECF No. 7-1 at 136 (brief of appellant, May 20, 1997).

Johnson's petition for writ of certiorari was denied by the Court of Appeals on May 20, 1997.  *Id.*

at 133.  The petition for writ of certiorari was denied by the Court of Appeals on July 24, 1997.

*Id*. at 145.

7

Johnson's post-conviction petition, raising ineffective assistance of counsel claims, was denied by the Circuit Court for Baltimore City on October 26, 1999.  ECF 7-1 at 161-83 (Memorandum and Order; J. Angeletti).  Johnson, through his attorneys, filed an application for leave to appeal the denial of post-conviction relief with the Court of Special Appeals.  *Id*. at 184-96.  The Court of Special Appeals denied the application on March 23, 2001.  *Id*. at 197-98.  The mandate issued on July 20, 2001.  *Id*. at 199.

On November 15, 2016 Johnson filed a Motion to Reopen Post-Conviction Proceedings in the Circuit Court for Baltimore City.  ECF No. 7-1 at 462 (Mem. Op. and Order).  Resolution of the motion was delayed due to the fact that Johnson also had a Petition for Writ of Actual Innocence pending in the same court.  *Id*.  In a Memorandum Opinion and Order dated March 4, 2020, the Motion to Reopen was denied.  *Id*. at 462-69.  Johnson's Application for Leave to Appeal the denial of his motion (*id*. at 470-72) was summarily denied on October 28, 2020.  *Id*. at 474-76.

### C.    Actual Innocence Proceedings

Johnson through counsel filed a Petition for Writ of Actual Innocence on August 24, 2012. ECF No. 7-1 at 200-11 (Petition).  The new evidence upon which the petition was based consisted of an affidavit from William James Taylor that it was he who shot and killed Willett accidentally when he was attempting to shoot Lawrence Walker.  *Id*. at 206.  Taylor, who was incarcerated at North Branch Correctional Institution ("NBCI") where Johnson was also confined, believed that Walker had assaulted and robbed his brother shortly before the shooting.  *Id*.  Taylor was convicted of first-degree murder in Baltimore City on January 20, 1994.  *Id*. at 207.  Taylor claimed that on March 29, 1992, he took a "small, dark-colored, 'hack'" to the area where Gold, Brunt, and Pennsylvania Streets intersect.  *Id*. at 207.  Taylor claimed he saw two people standing on the corner of Pennsylvania and Gold Streets near a carry-out restaurant, one of whom was Lawrence

Walker.  *Id*.  When Taylor saw Walker, he got out of the car he was in and began firing a handgun in Walker's direction.  *Id*.  He could not recall whether he used a .38 caliber or 9mm gun because both were "the types of guns [he] carried on [him] at the time."  *Id*.  Taylor said he shot Willett "by mistake" and after he did so, Walker ran south on Gold Street towards Division Street; Taylor ran after Walker but did not catch him.  *Id*.  Taylor maintained that he remembered "this particular shooting" because it occurred days after his brother's birthday and because he remembers being angered about the attack on his brother.  *Id*.

Taylor said he was never questioned by the police and did not know someone else had been arrested and convicted for Willett's murder.  *Id*.  Taylor adds that he learned from speaking to three people from the Innocence Project Clinic at the University of Baltimore School of Law that DeVaughn Johnson was the person convicted of killing Willet.  *Id*. at 208.  He explains that during his confinement to NBCI he has been assigned to administrative segregation and Johnson was not assigned to the same housing unit.  *Id*.  Taylor also claims that Johnson did not threaten him or promise any benefit to him for providing the affidavit.  *Id*.

Johnson also maintains that Hezekiah Marvin Allen's recantation of his trial testimony is new evidence supporting his actual innocence claim.  ECF No. 7-1 at 208-10.  In Allen's affidavit he acknowledged that he identified Johnson's picture as the shooter in Willett's murder, that he testified to that effect in front of the Grand Jury and in Johnson's trial.  *Id*. at 209.  Allen claims he was not telling the truth when he spoke with police, nor was he truthful in his testimony.  *Id*.  He states that the reason he identified Johnson was "the detective was threatening to charge me with this murder and also because he promised to make sure that I didn't do the ten years I was facing for a violation of probation charge."  *Id*.  Allen could not recall the names of the two

detectives, nor could he identify which of the detectives threatened to charge him with the murder.

*Id.*  Allen adds:

> The second time I was brought into the station for questioning was when I was told they might charge me with the murder.  I was also told that if I did what they needed me to do I wouldn't get any time for the VOP.
>
> I could tell by the way they showed me the pictures that the person they wanted me to pick as the shooter was Devon (Johnson).  The reason I thought this was because they showed the other pictures quickly.  When they showed Devo's pictures they left it for me to look at longer and that asked me questions about his picture.  They didn't ask questions about any of the other pictures. I could tell by the questions they were asking that they wanted me to say Devo was the shooter.
>
> At the time I was afraid I would be charged with the murder.  I was also facing ten years on my VOP and I was sure the judge would give me the whole 10 years.  I decided to lie about Johnson's involvement in the shooting so I wouldn't be charged with the murder and so I wouldn't get the 10 years.
>
> A lady State's Attorney also promised to relocate me to a new address.  She never did relocate me,
>
> After I testified in the trial of Johnson, I went to court on my VOP.  I was not violated.  I did not receive the 10 years or any time.  After I testified and went to court on my VOP I no longer had any of the conditions on my probation that I used to have, such as urine testing or reporting to a probation officer.  The reason this happened was because of the information I gave to the police and because I testified in Johnson's case.

ECF No. 7-1 at 208-9.

A hearing on Johnson's November 20, 2012 actual innocence petition was granted for November 16, 2013.  ECF No. 7-1 at 229.  The petition was, however, withdrawn without prejudice before the hearing took place.  *Id.*

Second Petition for Writ of Actual Innocence was filed November 17, 2016.  ECF 7-1 at 225-52.  The petition relies on the same affidavits from Taylor and Allen, but also cites to "suppressed police reports" (*id.* at 232-33) and *Brady* violations (*id.* at 233-39).  The police reports, obtained by Johnson in 2002, concern a police interview with Lakisha Hargrave during which she

said the "shooter was named Bryant Madison, that she had known him for two weeks, that he was 5'8" tall, 165-170 pounds, [and] had a light to medium complexion." *Id*. at 232.  The police report also notes that a witness had said that "Man" set the victim up and was involved in the shooting; Allen's nickname was Man.  *Id*. at 233.

The *Brady*[4] material referenced by Johnson in his Actual Innocence petition is based on the sworn affidavit of Allen, received by Johnson from a private investigator in April 2005.  ECF No. 7-1 at 234.  The pertinent part of Allen's affidavit states that he was threatened with murder charges if he did not cooperate and that he was promised a favorable outcome for a pending violation of probation charge.  *Id*.

On May 15 and 24, 2017, a hearing was held to consider Johnson's Actual Innocence Petition.  ECF No. 7-11; ECF No. 7-12.  Hezekiah Marvin Allen testified at the hearing and claimed that when he told police that Johnson was the shooter it was not true.  ECF No. 7-11 at 15.  He explained that he lied because the two police officers, who he could not name, threatened to charge him with the murder and promised to get rid of a violation of probation charge for which he faced ten years of incarceration.  *Id*. at 18.  He stated that the violation of probation charge was dismissed by Judge Kenneth Johnson and confirmed that the case was filed under the name Marvin Allen.  *Id*. at 22.  On cross-examination Allen acknowledged his prior testimony at trial was that the only promise made to him for his cooperation was to find a new place for him to live.  *Id*. at 39-41.  When asked by the judge presiding over the hearing what occurred at the violation of probation hearing, Allen said, "they told" Judge Johnson that he had testified in a trial and wanted the violation to be dismissed.  *Id*. at 39-41.  Allen later admitted he couldn't remember if he appeared before Judge Johnson for the probation violation hearing.  *Id*. at 44.

---

[4]        *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

William Charles Taylor testified that on March 29, 1992, he was the one who shot and killed Willett by accident, explaining he was attempting to kill Lawrence Walker.  ECF No. 7-11 at 48-49.  Taylor testified that he became aware that Johnson was locked up for the shooting around December of 2009 when Johnson approached him while delivering meals to the administrative segregation tier at NBCI.  *Id*. at 49.  At that time, Taylor declined to talk about the shooting because he was uncertain whether Johnson was angry about Taylor killing Willett.  *Id*. at 49-50.  Taylor recalled that a couple of days later Johnson asked him if he could send someone to talk to him and Taylor agreed.  *Id*. at 50.  According to Taylor, he never told Johnson that he shot Willett.  *Id*. at 51.

On April 23, 2010, Taylor met with Prenterald Charles Price, a private investigator hired by Johnson's family to assist in the investigation for his post-conviction proceedings.  ECF No. 7-11 at 57; 100; and 106.  Taylor stated that he agreed to testify because it was the right thing to do and that he did not even know Johnson.  *Id*. at 57-58.  After testifying that he was told on March 25, 1992, that his brother and his brother's friend were robbed and assaulted by Walker, Taylor maintained that he recalled the events leading up to the shooting because it occurred around his brother's birthday.  *Id*. at 66-67.  Taylor claimed he saw Walker on Pennsylvania and Gold, so Taylor crossed the street and started firing at Walker.  *Id*. at 53.  Taylor confirmed he is 5'11" tall. *Id*. at 57.

Under cross-examination Taylor claimed he remembered his brother's birthday in 1992 because he celebrated his birthday with him at a bar in Baltimore.  ECF No. 7-11 at 67.  He claimed he knew about the assault on his brother because he was told about it and it was the talk of the town.  *Id*. at 65-67.  Later during the same cross-examination, Taylor was asked about a 1987 robbery conviction and confirmed that he was released from the Division of Correction at the end

12

of 1991 or the beginning of 1992. *Id*. at 77-78. In closing argument, the State revealed that Taylor was not released from the Division of Correction until March 28, 1992, at 4:00 p.m. from Roxbury Correctional Institution in Hagerstown, Maryland and argued he could not have been celebrating his brother's birthday as he had stated in his testimony. ECF No. 7-12 at 99-100.

Johnson testified at the hearing about information that was not provided to him or his attorney prior to trial. ECF No. 7-12 at 14-21. He stated that at the time of the shooting he was 5'5" tall and weighed 160 pounds, but the homicide file indicates that there were suspects who were taller than 5'5". *Id*. at 14. Johnson pointed out Lekisha Hargrave's original statement to police where she stated that "Bryant Madison" was 5'8" tall and weighed between 165 and 170 pounds. *Id*. at 16. Additionally, a witness who told police that Allen set up the shooting and a report that the shooter was between 5'8" and 5'10" tall with a large build, and three gold teeth were not provided to the defense prior to trial. *Id*. at 17; 19-20. Johnson testified that he has never had gold teeth. *Id.* at 20.

Detective Robert Patton testified at the hearing for the State. ECF No. 7-12 at 48-76. Patton recalled that the first name developed during their investigation was Dan Petway, an alias Johnson admitted to using during his testimony at the actual innocence hearing. *Id*. at 46, 49. Patton stated that no name other than Johnson's came up during his investigation as the possible shooter in connection with Marvin Willett's murder. *Id*. at 52-53. Patton had never heard from or about William Taylor and denied forcing Allen to make an identification. *Id*. at 53. He explained that had Allen received leniency in a violation of probation case there would have been a significant paper trail because the prosecutor's office would have to be involved and reports would have been written; no such paper trail exists. *Id*. at 54. Patton confirmed that shootings on the West side of Baltimore around Pennsylvania and Gold Streets in the early 1990s were not unusual.

13

*Id*.  Through Patton, a ballistics report was introduced to show inconsistency between the bullet recovered as evidence in the case, a "special" .38 caliber bullet, and the bullet that Taylor claimed he used, a regular .38 caliber bullet.  *Id*. at 55-56.

In an opinion dated February 14, 2018, the Circuit Court for Baltimore City denied Johnson's Petition for Writ of Actual Innocence.  ECF No. 7-1 at 346-52.  The court found that "Allen's post-trial statements in which he claims that [Johnson] was not the shooter is clearly not newly discovered since Allen testified *at [Johnson's] trial* that he could not identify the shooter; and further that the police threatened to charge Allen with murder if he did not identify [Johnson] as the shooter."  *Id*. at 347, citing Tr. Trans. (9/13/95) at 76, 78-79[5] (emphasis in original).  The court also found that Allen was not a credible witness and did not believe his claim that he was offered any "inducements" by the State for his trial testimony.  *Id*. at 348.  Further, the court found that since Allen's trial testimony was conflicting "there would have been little, if any, reason for the State to have followed through with any alleged offer of assistance to Allen."  *Id*.  Lastly, the court found that the pending violation of probation charge against Allen should have been uncovered by trial counsel through the exercise of due diligence.  *Id*.

With respect to Taylor's claim that he and not Johnson was the actual shooter, the Actual Innocence court found his testimony lacked credibility "[h]aving observed the demeanor and manner of testifying."  ECF No. 7-1 at 348.  The court explained:

> Petitioner testified that in 2009, he allegedly heard from another inmate known only as "Tony Bone" that Bone overheard someone else in the prison talking about a murder that happened at Pennsylvania and Gold Streets in Baltimore City in 1992.  Petitioner further testified that he was later able to speak to this other person who was identified as William Taylor.  Petitioner and Taylor both testified that their *only* interaction consisted of two extremely short meetings ("20, 30 seconds") in 2009 while the Petitioner was handing out meals to other inmates.  Taylor testified that at the first meeting, the Petitioner told Taylor that Petitioner wanted to ask him about "the incident that happened on March 29th"

---

[5]     The trial transcript for September 13, 1995 corresponds to ECF No. 7-7 in the record before this Court.

and Taylor said no.  At the second meeting, Petitioner asked Taylor if Petitioner "could send someone at" Taylor and Taylor said yes.  They both testified that they had no discussion about the shooting at that time or any other time.  Nonetheless, the Petitioner was somehow able to send an investigator to meet with Taylor to get a statement in which Taylor miraculously exonerated the Petitioner by admitting to the same murder for which the Petitioner was convicted 14 years before.

Mr. Taylor's testimony at the hearing and his recollection of the events about the shooting over twenty-five years earlier was also nothing short of astonishing.  For instance, he remembered that on March 25, 1992, four days before the murder, he celebrated his brother's birthday in a little bar "off Gay Street" and also remembered the exact dates on which he did *not* look for the person who allegedly robbed his brother – March 26, 27, and 28, 1992.  However, the State produced records that Taylor was not even released from the Division of Correction facility in Hagerstown until March 28, 1992, after serving a five year sentence. . . .  He further remembered that he took a "dark colored hack" by himself to the west side of Baltimore City right before the shooting, and took another "dark colored hack" on the way home after the shooting.  To cover all the bases, Taylor even conveniently testified to carrying two types (9MM and .38 caliber) of the most common handguns when questioned as to what gun he may have used in the shooting.

Taylor is also presently serving a sentence well in excess of life.  Consequently, taking responsibility for a murder committed twenty-five years ago hardly exposes Taylor to the possibility of additional punishment.  Further, the chances that the State would now charge Taylor are extremely remote after the State has so vigorously defended the Petitioner's conviction in this proceeding.  Finally, despite Taylor's testimony regarding his alleged concern about doing the "right thing," Taylor never contacted the police about his involvement in the homicide.

ECF No. 7-1 at 349-50 (internal citations omitted; emphasis in original).  After discussing the long line of cases cautioning against the reliability of post-trial statements by persons who claim responsibility for the crime (*id*. at 350), the court then concluded that "Taylor's affidavit and testimony are neither material nor create a substantial or significant possibility that the result would have been different."  *Id*. at 351.

The court also discounted Johnson's claim that police reports describing other suspects had not been provided to the defense prior to trial both because discovery had taken place over twenty years ago and because Johnson had provided no record of what discovery had been provided by

the State.  ECF No. 7-1 at 351-52.  While the court acknowledged that the "discovery chronology in this case is also muddled by the fact that [Johnson's] trial counsel lost [his] file before trial and the State later assisted in its reconstruction," the court gave weight to Detective Patton's testimony that such reports are normally given to the State's Attorney's Office for production in discovery. *Id*. at 351, n. 11.

Johnson's counsel filed an appeal of the Circuit Court's decision on November 5, 2018. ECF No. 7-1 at 353-384.  By unpublished opinion dated September 3, 2019, the Court of Special Appeals affirmed the Circuit Court's decision denying the writ noting in summary that "each piece of evidence presented by Johnson is either not new or was determined to not be credible."  *Id*. at 441-47.  Johnson sought certiorari review with the Court of Appeals on September 21, 2019.  *Id*. at 448 (notice from the Court of Appeals); 450-60 (petition). The petition for writ of certiorari was denied by Order dated January 24, 2020.  *Id*. at 461.

### D.    Petition for Writ of Habeas Corpus

In his petition filed with this Court, Johnson raises six grounds for relief.  ECF No. 1.  He claims that the State court erred when it denied his Petition for Writ of Actual Innocence (*id*. at 11-14); the State court erred when it refused to admit evidence that Detective Patton withheld exculpatory evidence in at least two other criminal cases which were later reversed (*id*. at 14-17); the State court erred when it found that Allen provided the same testimony at trial as he did at the actual innocence hearing (*id*. at 17-19); the State court erred in denying his petition to reopen post-conviction proceedings given that he is entitled to relief on his *Brady* claim, *i.e.*, that Allen's violation of probation charge was dismissed in exchange for his testimony (*id*. at 19-21); the State violated *Brady* when it did not disclose important information in police reports that could be used to impeach Lakisha Hargrave (*id*. at 21-23); and ineffective assistance of counsel (*id*. at 23-29).

As noted, the asserted basis for excusing the untimeliness of the petition is Johnson's claim of actual innocence.  Johnson's petition is deemed filed on December 18, 2020, the date he mailed the petition.  ECF No. 1 at 48 (certificate of service).

## II.   Standard of Review

### A.   Statute of Limitation

A Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254 is subject to the one-year filing limitation provisions found in § 2244, which provides that the filing period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

"[T]he one year limitation period is also subject to equitable tolling in 'those rare instances where -- due to circumstances external to the party's own conduct -- it would be unconscionable to enforce the limitation against the party and gross injustice would result.'"  *Hill v. Braxton*, 277 F.3d 701, 704 (4th Cir. 2002) quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000).  To be entitled to equitable tolling, a federal habeas petitioner must establish that either some

wrongful conduct by Respondents contributed to his delay in filing his petition or that circumstances that were beyond his control caused the delay. *See Harris*, 209 F.3d at 330. A federal habeas petition does not toll the one-year limitation period. *See Duncan v. Walker*, 533 U.S. 167, 175 (2001) (a federal habeas petition is not an application for State post-conviction or other collateral review within the meaning of § 2244(d)(2) and therefore does not toll the limitation period while it is pending).

### B.  Actual Innocence

Actual innocence is an "equitable *exception* to § 2244(d)(1), not an extension of the time statutorily prescribed." *McQuiggin v. Perkins*, 569 U.S. 383, 391 (2013) (emphasis in original). "[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief." *Id*. at 392. The merits of a petition which is concededly time-barred, may be reached if "new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *Id*. at 395, quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995). In the context of an untimely petition, "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." *Perkins*, 569 at 399. "It would be bizarre to hold that a habeas petitioner who asserts a convincing claim of actual innocence may overcome the statutory time bar § 2244(d)(1)(D) erects, yet simultaneously encounter a court-fashioned diligence barrier to pursuit of [his] petition." *Id*. "This rule, or fundamental miscarriage of justice exception, is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Id*. at 392.

Examples of the type of new evidence that have been found to satisfy the actual innocence gateway standard are: (1) new DNA evidence and expert testimony "call[ing] into question" the

"central forensic proof connecting [the petitioner] to the crime," as well as "substantial evidence pointing to a different suspect," *House v. Bell*, 547 U.S. 518, 540-41 (2006); (2) "sworn statements of several eyewitnesses that [the petitioner inmate] was not involved in the crime" and affidavits "that cast doubt on whether [the petitioner inmate] could have participated" in the offense, *Schlup*, 513 U.S. at 331; (3) a third party's consistent and repeated statement that the third party committed the offense, *Jones v. McKee*, No. 08 CV 4429, 2010 WL 3522947, at *9-10 (N.D. Ill. Sept. 2, 2010); *Carringer v. Stewart*, 132 F.3d 463, 478-79 (9th Cir. 1997) (finding that the petitioner opened the actual innocence gateway where another person testified under oath that he committed the offense and separately boasted to other individuals that he set-up the petitioner); and (4) documentary evidence indicating that the petitioner was in another country on the day of the offense and five affidavits from individuals stating that the petitioner was outside the country at the precise time of the offense, *see Garcia v. Portuondo*, 334 F. Supp. 2d 446, 452-56 (S.D.N.Y. 2004). *See generally Schlup*, 513 U.S. at 324 (providing the Supreme Court's statement that examples of sufficient new reliable evidence for a gateway claim including "exculpatory evidence, trustworthy eyewitness accounts, or critical physical evidence").

Whether a petitioner has satisfied the miscarriage of justice exception it requires the reviewing court to consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (internal quotation marks omitted). The new evidence must be evaluated with any other admissible evidence of guilt. *Wilson*, 155 F.3d at 404-05. "'To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial." *Schlup*, 513 U.S. at 324. "Without any new evidence of innocence, even the existence of a

concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Id.* at 315–17.

The Supreme Court "caution[ed], however, that tenable actual-innocence gateway claims are rare: 'A petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror acting reasonably would have voted to find him guilty beyond a reasonable doubt.'" *Perkins*, 569 U.S. at 386 (brackets omitted) (quoting *Schlup*, 513 U.S. at 329; *House*, 547 U.S. at 538; *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) ("Claims of actual innocence . . . should not be granted casually.") (internal citations omitted). To sustain a credible claim of actual innocence a Petitioner must marshal "new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S at 324. "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324. The gateway actual innocence "standard is demanding and permits review only in the extraordinary case." *House*, 547 U.S. at 538 (citation omitted); *see, e.g., Perkins*, 569 U.S. at 401 ("We stress once again that the [actual innocence] standard is demanding."); *Wilson*, 155 F.3d at 404 ("Claims of actual innocence . . . presented . . . as gateways to excuse a procedural default . . . should not be granted casually.").

"At the same time, though, the [actual innocence] standard does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538. "Rather, the petitioner must demonstrate that more likely than not, in light of new and reliable evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Teleguz v. Zook*, 806 F.3d 803, 809 (4th Cir. 2015) (citing *House*, 547 U.S. at 538). The actual innocence determination "requires a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-

doubt standard." *House*, 547 U.S. at 539 (internal citations and quotations omitted); *Finch v. McKoy*, 914 F3d 292 (4th Cir. 2019).

In reviewing the record, the Court must "make a probabilistic determination about what reasonable, properly instructed jurors would do. The Court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538 (internal citations and quotations omitted). The petitioner must "demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice. Only if petitioner passes through the actual innocence gateway by satisfying this standard, can this Court consider and reach the merits of his claims." *Teleguz*, 689 F.3d at 329 (internal citations omitted).

### III.   Analysis

There can be no doubt that Johnson's Petition has been filed outside of the one-year limitation period applicable to his conviction. The one-year filing period began on the date Johnson's conviction became final on direct review which is the date his Petition for Writ of Certiorari was due in the United States Supreme Court: October 22, 1997 and expired one-year later. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012) (where criminal defendant seeks review in the State's highest court judgment becomes final when the time for pursuing review in the Supreme Court expires). Johnson did not file any "properly filed application for State post-conviction or other collateral review" prior to the expiration of the one-year filing deadline therefore it was not tolled under 28 U.S.C. § 2244(d)(2). Nor do any of the other statutory tolling provision apply to Johnson's petition.

In his Motion to Establish Entitlement for Review of the Merits, Johnson relies on actual innocence as a basis for equitably tolling the limitations period and argues that the State court's decision was "contrary to the weight of the evidence presented at the evidentiary hearing."  ECF No. 9 at 2.  Johnson additionally argues that the State's actions in "procuring and presenting fabricated evidence severely impeded" his "ability to refute key witnesses' testimony."  *Id*.  He states that "it is certainly a factor when the primary homicide detective is named in several million dollar lawsuits[6] as having an extremely casual relationship with the truth" and that Detective Patton "has been proven to be 'less than honest.'"  *Id*.

The evidence Johnson relies on to support his claim of actual innocence does not bear the indicia of reliability or credibility required by *Perkins* or *Shlup*.  The three eyewitnesses at Johnson's trial provided equivocal testimony when identifying Johnson as the shooter.  While Allen's trial testimony was somewhat stronger than the trial testimony of Hargrave, who claimed a complete memory loss (*see* ECF No. 7-6 at 16-19), and Conyers, who simply denied ever testifying before the grand jury (*see* ECF No. 7-7 at 31), Allen also attempted to weaken his identification of Johnson as the shooter during his trial testimony (*see id*. at 76, 78-79).  Allen claimed at the trial that police threatened to prosecute him for the murder during his questioning about the shooting[7] and said that he never saw Johnson with a gun in his hand.  *Id*.  Even with the equivocal eyewitness identifications of Johnson, the jury found him guilty of the murder.  Allen's

---

[6]     One of the lawsuits mentioned at Johnson's actual innocence hearing was litigated in this Court.  *See Burgess v. Officers of Balt. Police Dept., et al.*, Civil Action RDB-15-834 (D. Md. 2017).  The civil jury verdict was returned on November 21, 2017 in favor of Burgess and against Gerald Goldstein of the Baltimore City Police for $15 million.  *Id*. at ECF 366. In the Fourth Circuit published opinion, *Burgess v. Goldstein*, 997 F.3d 541 (4th Cir. 2021) reversing and affirming in part, the case was remanded for reconsideration of this Court's dismissal of a *Monell* claim against the Baltimore City Police Dept.  *Id*. at 563.  The Fourth Circuit noted in its opinion that "[b]y the time the case went to the jury, the only remaining defendant was Goldstein."  *Id*. at 548.  While Detective Patton was named as a defendant, the claims against him were dismissed and that portion of this Court's decision was not challenged on appeal.

[7]     Conyers made a similar claim during his trial testimony.  *See* ECF No. 7-7 at 45-46.

refutation of his trial testimony some 25 years later does not differ in any meaningful respect from his equivocal trial testimony.

The jury also had the opportunity to consider the possibility that someone other than Johnson committed the murder when the defense called two witnesses to testify that they saw a different man involved in the shooting. *See* ECF No. 7-7 at 97-98, 101 (Bradford testimony) and ECF No. 7-8 at 10 (Brooks testimony). The police records that Johnson asserts described people who did not match his description do not constitute evidence that would have likely persuaded a reasonable, properly instructed jury to reach a different verdict because they did in fact consider similar evidence. Thus, the Allen recantation and the police records are not "reliable evidence not presented at trial." *Calderon v. Thompson,* 523 U.S. 538, 559 (1998).

The Taylor affidavit submitted by Johnson to the actual innocence court was discounted after Taylor testified at the actual innocence hearing. While declarations of guilt by another are among the types of new evidence warranting a finding that a petitioner has satisfied the actual innocence gateway, the declaration must be credible. *See Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir.1999). In considering Taylor's declaration of guilt, the passage of time between the date (April 23, 2010) he first acknowledged to a private investigator that he committed the murder together with his failure to contact police regarding his culpability in the ensuing seven years before the actual innocence hearing (May 15, 2017); and his recall of some details of the days leading up to the crime coupled with the ambiguities in his descriptions of how he got to the crime scene, what gun he used, the type of bullets he used, and how he got away, are all factors that weigh heavily against finding his declaration of guilt credible. As noted, actual innocence is a difficult standard to establish and, like many before him, Johnson has not satisfied that standard and his untimely petition must therefore be dismissed.

**IV.     Certificate of Appealability**

When a district court dismisses a habeas petition solely on procedural grounds, a certificate

of appealability will not issue unless the petitioner can demonstrate both "(1) 'that jurists of reason

would find it debatable whether the petition states a valid claim of the denial of a constitutional

right' and (2) 'that jurists of reason would find it debatable whether the district court was correct

in its procedural ruling.'" *Rose v. Lee,* 252 F.3d 676, 684 (4th Cir. 2001) (quoting *Slack v.

McDaniel,* 529 U.S. 473, 484 (2000)).  This Court finds that Johnson has not demonstrated that a

certificate of appealability should issue.  He may still request that the United States Court of

Appeals for the Fourth Circuit issue such a certificate.  *See Lyons v. Lee*, 316 F.3d 528, 532 (4th

Cir. 2003) (considering whether to grant a certificate of appealability after the district court

declined to issue one).

By separate Order which follows, the Petition for Writ of Habeas Corpus shall be dismissed

as untimely; Johnson's Motion to Establish Entitlement to Review (ECF No. 9) shall be denied;

and a certificate of appealability shall not issue.


  October 25, 2021                              /s/_____
Date                                            GEORGE J. HAZEL
                                                United States District Judge